CHARLESTON & WESTERN CARO-
LINA RAILWAY COMPANY
et al., Petitioners,

v.

FEDERAL POWER COMMISSION,
Respondent,
Southern Natural Gas Company,
Intervenor,
South Carolina Generating Company,
Intervenor.

No. 12805.

United States Court of Appeals
District of Columbia Circuit.

Argued March 12, 1956.

Decided May 17, 1956.

Mr. Urchie B. Ellis, Wilmington, Del., of the bar of the Supreme Court of Illinois, pro hac vice, by special leave of Court, with whom Messrs. Robert J. Corber, George B. Mickum, III, Tom J. McGrath and Jerome J. McGrath, Washington, D. C., were on the brief, for petitioners.

Mr. William L. Ellis, Attorney, Federal Power Commission, with whom Messrs. Willard W. Gatchell, General Counsel, Federal Power Commission, and William J. Grove, Assistant General Counsel, Federal Power Commission, were on the brief, for respondent.

Mr. William S. Tarver, Washington, D. C., for Intervenor Southern Natural Gas Co.

Messrs. Harry A. Poth, Jr., and Francis H. Caskin, Washington, D. C., were on the brief for Intervenor South Carolina Generating Co.

Before PRETTYMAN, FAHY and WASHINGTON, Circuit Judges.

FAHY, Circuit Judge.

The Federal Power Commission issued an order that affirmed a decision of its Presiding Examiner and authorized the Southern Natural Gas Company to construct and operate certain natural gas facilities. The facilities consist of 2.2 miles of pipeline and appurtenances for the delivery of natural gas to Plant Urquhart of the South Carolina Generating Company, located near Augusta, Georgia, the gas to be used there as boiler fuel in the generation of electricity. The order was the result of proceedings before the Commission upon the application of Southern, filed pursuant to section 7(e)

of the Natural Gas Act, 56 Stat. 84 (1942), 15 U.S.C.A. § 717f(e), for a certificate of public convenience and necessity. The petitioners in this court intervened before the Commission to oppose issuance of the certificate, and now attack the validity of the order granting it.

Plant Urquhart has three electric generating units. By means of the new facility Southern proposes to deliver to the Plant, on an interruptible basis, a maximum of 60,000 Mcf of natural gas per day. Plant Urquhart's entire electric capacity is used by three customers, one of which devotes all power obtained from the Plant to the Savannah River Project of the Atomic Energy Commission.

The making available of natural gas to Plant Urquhart by means of the questioned facility will cause Plant Urquhart to discontinue to considerable degree the use of coal, heretofore the basic fuel for firing its boilers. Petitioners are railroads which transport this coal, an association of coal producers, the United Mine Workers of America, whose members actually mine the coal, and others in somewhat comparable economic relationship to the displacement of coal by natural gas as the basic boiler fuel at Plant Urquhart. They contest the validity of the certificate to Southern on the ground that the present or future public convenience and necessity do not require its issuance. See section 7(e) of the Act. Their position primarily is that the loss of revenues to coal and railroad interests that would result from such displacement of coal would injure the public interest more than would be compensated by the benefits of the facility; or, otherwise stated, that there is no affirmative showing that public convenience and necessity require grant of the application.[1]

The Presiding Examiner found that the increase in Southern's revenues through sales of natural gas to the Generating Company would partially offset losses suffered by Southern through a recent cutback in sales to other consumers; that Southern's off-peak load would be diversified and its load factor increased, which would tend to decrease and stabilize unit costs for all gas delivered; that Southern could supply the needs of Plant Urquhart for more than ten years without diminishing the supply of gas available to its other customers; that fuel savings to the Generating Company of approximately $393,000 annually would result; and that this saving would be passed on to its three customers already referred to, and should eventually redound to the benefit of the ultimate consumers of the electricity supplied by those customers. There was testimony that some 92,000 tons of coal would continue to be used each year at Plant Urquhart during periods of interruption or curtailment of the gas service.

Evidence bearing on the claimed economic detriment to the petitioners demonstrated that there would be a displacement of approximately 347,000 tons of coal annually, paid for at the rate of about $4.00 per ton at the mine. However, these statistics were not translated by the evidence into figures showing net decrease of revenues to mine-owner petitioners, nor was the specific effect of the displacement on sales or mine employment shown. Similarly, it was shown, as the Examiner stated, that the railroads would lose gross revenues equal to the coal tonnage displaced by gas times the freight rate per ton, which is somewhat in excess of $4.00, but the railroad petitioners made no attempt to show the actual net loss to them in operating revenues. There was some evidence that a modernization program being conducted by the Charleston & Western Carolina Railway, a petitioner, might be retarded by its loss of revenues, though the Examiner thought this was far from certain. In the end the Examiner found and concluded that the construction and oper-

---

[1] The other § 7(e) requirements for the grant, namely, that "the applicant is able and willing properly to do the acts and to perform the service proposed and to conform to the provisions of the Act and the requirements, rules, and regulations of the Commission thereunder," are not seriously in question.

ation of the proposed facilities by Southern was required by the public convenience and necessity; and, as we have stated, the Commission, after consideration of exceptions by intervenors and motions to reopen, denied the latter and affirmed the Presiding Examiner's decision, two Commissioners dissenting.

The closeness of the case is indicated by the nature of the dissent. The dissenting Commissioners said it was so close that the staff brief before the Commission took no position one way or the other and that the Examiner's treatment of the question of public convenience and necessity was nebulous and lacking in conviction because of the existence of so many variable factors in the evidence. "In these circumstances," they said, "the primary issue becomes a question of conservation of natural gas and we have a clear-cut case of whether to authorize the burning of quantities of this natural resource under boilers, where the evidence is clear that other fuels are readily and economically available, or to deny such authorization and preserve such quantities for superior uses." They thought the latter should be done.

In the circumstances that we have outlined we find no legal basis for overturning the decision of the Commission. The Commission weighed the factors which competed in their minds on the issue of public convenience and necessity, with the evidence bearing thereon. Important among these factors is the public interest in railroad transportation, and in the status of coal mining in its employment and other economic aspects. But the Commission considered these matters. The conclusion reached in favor of the application is not unreasonable, and no significant procedural error appears. It is true, we think, that the public interest as represented by the adverse effects on petitioners will suffer by grant of the certificate to Southern. But the public interest as represented by benefits to Southern, to the Generating Company, to customers of the latter and to ultimate consumers, could reasonably be found by the Commission to be decisive. Had the decision initially been for us we might have reached a different conclusion, on the ground of the dissent or on other grounds. But the judgment of the Commission was within its legal competence. We are somewhat fortified in so holding by the inability of petitioners to be more specific as to their net losses, and by the further fact that the Urquhart Plant is only a few years old, from which it follows that the diversion from coal to gas as the basic fuel at the Plant is a reversion as it were to the situation which prevailed only a few years ago insofar as coal is concerned. In the end the petitioners' case, though strong, cannot prevail in the courts after having failed before the Commission.

Affirmed.